# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | DIVISION ONE |
| Respondent, | ) ) ) | No. 76745-3-I |
| v. | ) ) | UNPUBLISHED OPINION |
| RODERICK LUTHER KING-PICKETT, | ) ) ) | |
| Appellant. | ) ) | FILED: July 31, 2017 |
| | ) | |

DWYER, J. — Roderick King-Pickett appeals from the judgment entered on a jury's verdict finding him guilty of one count of burglary in the first degree and one count of robbery in the first degree. On appeal, King-Pickett asserts that the prosecutor committed misconduct during closing argument, that his counsel was ineffective for failing to object to the prosecutor's closing argument, and that the trial court erred in the manner in which it instructed the jury as to the definition of reasonable doubt. Finding no error, we affirm.

I

Michael Freeman-Lema and Macenzee Opp returned home one evening to find their residence in disarray. Freeman-Lema told Opp to wait outside while he searched inside. Once inside, he retrieved a firearm from a nearby closet. He continued to search the home and discovered an unknown person in a dark grey hoodie sitting in a deck chair on his residence's back porch.

Freeman-Lema pointed the firearm at the person and told him to leave. The intruder ignored Freeman-Lema's demand and, with a knife and hammer in hand, began to approach Freeman-Lema. The intruder re-entered the residence through the porch's sliding glass door and Freeman-Lema again told the intruder to leave. As the intruder continued his approach, Freeman-Lema fired a gunshot, aiming for the intruder's shoulder.

The intruder then fled from the home with a nondescript white bag in his hand. Opp, who was waiting outside, saw the intruder as he ran away. Opp called 911, describing the intruder as "[b]lack, a really dark skinned male. He has a grey sweatshirt on with a hoodie over it, jeans, white tennis shoes, and he has a white garbage bag in his hand." Officer Ben Taylor arrived at the scene shortly thereafter and began to interview Freeman-Lema and Opp.

Corporal Ryan Junker, alerted to the incident and the description of the suspect, searched the nearby area in a police cruiser. Within a mile of Freeman-Lema and Opp's home, Corporal Junker noticed King-Pickett walking down the center of a street with a white plastic bag in his hand. Upon closer inspection, Corporal Junker determined that King-Pickett matched the physical description of the suspect, noted that King-Pickett was sweating heavily on a cool evening, and saw a dark grey sweatshirt laying on top of the white bag that King-Pickett carried. King-Pickett was subsequently arrested and taken into custody.

Shortly thereafter, another police officer, Richard Lagerquist, transported Freeman-Lema and Opp separately in his patrol car to Corporal Junker's location to determine whether they could identify King-Pickett as the intruder and whether

the items found in the white bag belonged to either of them. When Freeman-Lema and Officer Lagerquist arrived, Corporal Junker instructed King-Pickett to face the patrol car. Officer Lagerquist recalled that Freeman-Lema said:

> [Y]eah, that's him. I asked him how sure he was, and he said 5 or 8 percent. I asked him if he meant if that was out of 100 percent? He said, no. If it's at 100 percent, that he's 70 percent sure that it was the person -- the person stopped was the person that was involved in the incident.

Opp was not asked to identify King-Pickett as the intruder.

The items found in the white bag had been laid on the ground. Opp was able to identify several items as having been taken from her residence, including a lighter and chain necklace owned by Freeman-Lema, clothes that Opp had purchased for her nephews, and an electronic tablet device and its charger. When asked for the password for the device, Opp told Corporal Junker the 4-digit key code. Corporal Junker entered the key code into the device, the device unlocked, and Opp identified its content as her own.

King-Pickett was charged with one count of burglary in the first degree and one count of robbery in the first degree.

A two-day trial ensued. The State called Freeman-Lema, Opp, and the police officers who were involved in the investigation as witnesses.

Freeman-Lema testified to his interaction with the intruder. Freeman-Lema later testified that, when Officer Lagerquist took him to see King-Pickett on the night of the incident, he told the officer that he was 70 percent *unsure* that King-Pickett was the intruder.

Freeman-Lema also testified regarding a telephone conversation that he had with Officer Taylor a few days after the incident. Freeman-Lema testified that, "I said that there was something wrong because I heard through certain people I had accusations saying that I knew who it was, and I said that it was the individual, but I never did." He continued, "Somebody walked up to me because I -- like I said, I know quite a few people" and "that caused me to give a phone call to say that your report must be wrong because I didn't say that."[1]

Freeman-Lema also testified that he did not want to testify in court that day, explaining, "I don't like dealing with this stuff. This is just ridiculous. I don't want to be here." In addition, in response to questioning by the prosecutor, Freeman-Lema testified that no one had placed him in fear of testifying or told him not to testify.

The State also presented the testimony of Officer Lagerquist, who stated that, contrary to Freeman-Lema's earlier testimony, upon viewing King-Pickett on the night of the incident, Freeman-Lema said that he was 70 percent *sure* that King-Pickett was the intruder.

Later, after the State rested its case in chief, defense counsel rested without calling any witnesses. The State and King-Pickett each gave closing arguments. No objections were interposed during closing argument.

---

[1] The testimony was admitted, over the objection of defense counsel, for the purpose of showing Freeman-Lema's state of mind.

The jury returned a verdict finding King-Pickett guilty as charged. At sentencing, the trial court imposed legal financial obligations against King-Pickett, including a $200 criminal filing fee.

King-Pickett now appeals.

## II

King-Pickett asserts that the prosecutor engaged in misconduct by remarking in closing argument that Freeman-Lema could have been influenced into changing his testimony. This was improper, King-Pickett contends, because the trial court had explicitly excluded testimony proffered by the State to show that Freeman-Lema had been threatened into changing his identification of King-Pickett as the intruder. We disagree.

## A

To prevail on a claim of prosecutorial misconduct, the defendant must show that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and circumstances at trial. State v. Miles, 139 Wn. App. 879, 885, 162 P.3d 1169 (2007).

> The propriety of a prosecutor's conduct is "reviewed in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given." State v. Russell, 125 Wn.2d 24, 85-86, 882 P.2d 747 (1994). In closing argument, a prosecutor is afforded wide latitude to draw and express reasonable inferences from the evidence. State v. Hoffman, 116 Wn.2d 51, 94-95, 804 P.2d 577 (1991).

State v. Reed, 168 Wn. App. 553, 577, 278 P.3d 203 (2012).

B

The basis for King-Pickett's prosecutorial misconduct claim is a trial court

ruling excluding a portion of the State's proffered testimony of Officer Taylor.

Prior to that ruling, the issue of the admissibility of Freeman-Lema's conversation

with Officer Taylor had been raised. On the second day of trial, before the jury

was seated, the court had entertained a motion from the State to re-open its

direct examination of Freeman-Lema to discuss a telephone call that Freeman-

Lema had made to Officer Taylor a few days after the incident:

> [PROSECUTOR]: The other thing, Officer Taylor provided me with some information on this case; I would ask to -- just this morning. He may have provided it in the past, but I don't recall. I would ask to reopen my direct very briefly to just talk about the subject matter of that.
> Defense can interview Officer Taylor before he goes on the stand. I've already disclosed what this is about to Defense. So I'd just briefly ask to reopen my direct with Mr. Freeman-Lema.
> [DEFENSE COUNSEL]: I object, Your Honor. From what I heard back there from counsel, I don't see an inconsistent statement. I mean, he said that he didn't see somebody. And so now he's saying he doesn't see somebody. So how did he change his main story? He's not changing any story.
> THE COURT: I am going to allow you to reopen just to the limited purpose of any subsequent calls to the officer.

After the jury was seated, the prosecutor re-opened his direct examination

of Freeman-Lema:

> Q. (By [PROSECUTOR]) Good morning, Mr. Freeman-Lema. Just a few questions. After this event happened on September 4th, 2015, did you contact Officer Taylor a few days later?
> A. I don't recall.
> Q. Did you say anything to Officer Taylor about wanting to change your story, anything like that?
> A. No. I said that there was something wrong. I do remember actually now calling him. I said that there was something wrong because I heard through certain people I had

accusations saying that I knew who it was, and I said that it was the individual, but I never did.

Q. Explain what you mean by that.

A. Somebody walked up to me because I -- like I said, I know quite a few people. And somebody said --

[DEFENSE COUNSEL]: Objection. Hearsay.

[PROSECUTOR]: Goes to state of mind, Your Honor.

THE COURT: Overruled.

Q. (By [PROSECUTOR]) Go ahead, Mr. Freeman-Lema.

A. Somebody had just said I overheard that you were talking --

[DEFENSE COUNSEL]: Objection. Hearsay. Hearsay within hearsay.

THE COURT: Have him go on from not repeating what was said.

Q. (By [PROSECUTOR]) What --

A. So that caused me to give a phone call to say that your report must be wrong because I didn't say that.

Q. So what were you trying to fix about the original – or about the report?

A. Whatever -- I've never read the report. I never made a statement clearly. So for me to hear that somebody had made that put into the report, I was trying to let it be known that no, I don't do that -- I've never done that.

Later at trial, Officer Taylor testified as to whether he spoke with Freeman-Lema a few days after the incident. He began to explain,

I did. I gave both of them my phone number, my business phone number, and asked them if they could remember or need anything to give me a call. Mr. [Freeman-]Lema called me a few days later to tell me that he was confronted by one of his acquaintances and –

Defense counsel immediately interposed an objection, stating, "Your Honor. I thought we ruled on that."

The prosecutor requested that the jury be excused and, after the jury exited the court room, the trial judge requested an offer of proof from the State concerning Officer Taylor's testimony. The testimony offered, as elicited by the prosecutor, was as follows:

Q. Tell us about the conversation with Mr. Freeman-Lema, Officer.

A. So he called me to discuss that it was brought to his attention that he was told that he was able to identify the suspect 70 percent positively, and he wanted to let me know that that was not the case. That the officer -- or he could have misspoke. That it was a 30 percent chance that he knew that that was the suspect that was in his house.

Q. Did he say why he wanted to talk to you about this?

A. Because -- yes, he did. He wanted to tell me this because he had some acquaintances that were affiliated with some organizations that didn't find it kindly that he was testifying against somebody that they knew.

[PROSECUTOR]: That's the basis of the testimony, Your Honor.

The State explained that it offered the testimony to show Freeman-Lema's fearful state of mind in order to explain why he did not want to testify and why he may have changed his identification testimony between the night of the incident and the day that he called Officer Taylor.

The trial judge excluded the proffered testimony, concluding that its prejudice to King-Pickett outweighed its probative value. The trial judge indicated that the state of mind to which Freeman-Lema had testified was "that he wanted to correct that someone had the wrong impression," rather than because he felt threatened. The trial court further indicated that there was "no showing that any of this was done at the direction of the defendant." The prosecutor acknowledged the trial court's ruling and indicated that he had no further questions for Officer Taylor.

Thereafter, in closing argument, the prosecutor remarked, in pertinent part:

I imagine a big thing you'll discuss when you go back to deliberate is identity. Is this the guy that did it? I imagine Defense counsel is going to talk about it. So let's think what -- the identity we have.

Well, obviously we had enough of a description that less than a mile down the road they found the same guy who matched the description with their property 15 minutes after this happened.

You heard Ms. Opp's description on the 911 tape. Here on the stand, it's been months, and obviously remembering right as it's happening and right after is going to be better than it is months later. She gave a pretty detailed description on that 911 tape. She said jeans, white shoes, gray hoodie, shorter, African American, dark skinned.

And you may have been thinking to yourself during that 911 that's pretty much the guy we have in court. She gave a good description on that 911 tape as this was happening, seemingly as -- either as she was looking at him right then or right after he had run off.

And then there's the field show-up. Mr. Freeman-Lema says in that field show-up, yeah, I'm 70 percent sure that's the guy. 70 percent makes sense, the person had a hoodie on, but the height, the general description. And he said I'm pretty sure that's the bag he had as well.

Then Ms. Opp said, yeah, that is the bag. And she was able to identify the property and give the passcode for the iPad.

And here on the stand you heard from Mr. Freeman-Lema that he doesn't want to be here. He doesn't want to be a part of this. It seems like he's moved on with his life. For whatever reason, he didn't want to testify. Well, that doesn't mean the defendant's not guilty.

And he said on the stand I'm pretty sure I said to the police I'm 70 percent unsure that that's the person. He also said three or four days later he called law enforcement to attempt to correct the police report.

*There could have been outside influences. There could have been something that happened to Mr. Freeman-Lema that caused him to lessen his identification or change his story somewhat.* Either way that 911 tape the day in question right after this happened when it was fresh in their mind, they gave a pretty clear description that matched this person we have in court.

(Emphasis added.) Defense counsel did not interpose an objection during the prosecutor's closing argument.

## C

The prosecutor's remarks during closing argument were based on reasonable inferences drawn from the evidence adduced at trial. As mentioned, there was an important inconsistency between the testimony of Freeman-Lema and that of Officer Lagerquist regarding whether—on the night of the incident— Freeman-Lema said that he was "70 percent sure" or "unsure" in his identification of King-Pickett. In addition, Freeman-Lema had testified that—a few days after the incident—he had been approached by someone regarding his identification of King-Pickett and he felt it necessary to contact Officer Taylor to ensure that the officer understood that he had not, in actuality, identified King-Pickett that night. Freeman-Lema also testified that he did not want to testify in court in this matter. Taken together, a reasonable inference could be drawn that Freeman-Lema was somehow influenced into altering the certainty of his identification of King-Pickett between the night of the incident and when he contacted the police.

The trial court's ruling excluding a portion of Officer Taylor's proposed testimony regarding his telephone conversation with Freeman-Lema does not change that. Officer Taylor proposed to testify that Freeman-Lema contacted him and told him about "acquaintances that were affiliated with some organizations that didn't find it kindly that he was testifying against somebody that they knew." The trial court excluded this portion of Officer Taylor's testimony, ruling that its potential for prejudice outweighed its probative value.

This was the extent of the trial court's ruling. Nothing suggests that the trial court prohibited the prosecutor from drawing an inference—from testimony actually adduced at trial—that Freeman-Lema could have been influenced to alter his identification of King-Pickett.

King-Pickett fails to establish a basis for appellate relief.[2]

III

King-Pickett next contends that the trial court erred in instructing the jury on the concept of reasonable doubt. This is so, he avers, because the court gave as its instruction the jury instruction defining "reasonable doubt" set forth at 11 Washington Practice: Washington Pattern Jury Instructions: Criminal 4.01, at 85 (3d ed. 2008) (WPIC). King-Pickett contends that this instruction unconstitutionally undermines the presumption of innocence and shifts the burden of proof to the defendant. King-Pickett is incorrect.

Our Supreme Court has mandated that an instruction in the words of WPIC 4.01 be given in all cases. State v. Bennett, 161 Wn.2d 303, 318, 165 P.3d 1241 (2007). The constitutionality of the challenged instruction has been reaffirmed. State v. Kalebaugh, 183 Wn.2d 578, 586-87, 355 P.3d 253 (2015). We have recognized this controlling authority. State v. Lizarraga, 191 Wn. App. 530, 567, 364 P.3d 810 (2015), review denied, 185 Wn.2d 1022 (2016). The trial court did not err by doing the same.

---

[2] King-Pickett's claim that he received ineffective assistance of counsel because his attorney did not object to the challenged argument necessarily fails.

In any event, WPIC 4.01 does not implicitly require jurors to articulate a reason for doubting the State's case. "[A] doubt for which a reason exists" is not the same as "a doubt for which a reason can be given." Kalebaugh, 183 Wn.2d at 584. King-Pickett's argument is meritless.

## IV

King-Pickett next contends that the trial court erred by imposing a $200 criminal filing fee against him without first considering his financial condition and ability to pay. Applicable authority is to the contrary. State v. Lundy, 176 Wn. App. 96, 308 P.3d 755 (2013).

## V

King-Pickett requests that no appellate costs be imposed. The State has stated that it will not seek appellate costs in this matter. Accordingly, we direct that no such costs be imposed.[3]

Affirmed.

We concur:

---

[3] King-Pickett submitted a pro se statement of additional grounds. His first and second claims are repetitious of issues addressed herein. His third claim, that the trial judge was biased against him, is not sufficiently developed to warrant further analysis.