IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 71532-1-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | PUBLISHED OPINION |
| | ) | |
| JORGE LUIS LIZARRAGA, | ) | |
| | ) | |
| Appellant. | ) | FILED: December 7, 2015 |

SCHINDLER, J. — Following a six-week trial, the jury convicted Jorge Luis

Lizarraga of murder in the second degree of 18-year-old Devin Topps, two counts of

unlawful possession of a firearm, residential burglary, theft of a firearm, and possession

of a stolen firearm. Lizarraga seeks reversal of the murder conviction arguing that the

exclusion of inadmissible hearsay evidence violated his constitutional right to present a

defense and his right to a unanimous jury verdict. Lizarraga also seeks reversal of the

convictions arguing the court erred in denying his motion for a Frye[1] hearing and

admitting fingerprint and ballistics evidence, and using 11 Washington Practice:

Washington Pattern Jury Instructions: Criminal 4.01, at 85 (3d ed. 2008), to instruct the

jury on the meaning of "reasonable doubt." We reject Lizarraga's arguments, and

affirm.

---

[1] Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).

FACTS

October 27, 2010 Burglary

On October 27, 2010, Federal Way Police Officer Andrew Hensing responded to the report of a burglary at the home of Washington State Patrol Trooper Jason Keays. Officer Hensing found a lawn chair propped "up against the window on the exterior of the home" and "[t]he window . . . ajar." Trooper Keays said a number of items were missing including a laptop, coins from a coin jar, and his gun safe. Trooper Keays kept an "old service weapon"—a Heckler & Koch .40 caliber semiautomatic handgun with a "15-round capacity" in the gun safe. The bullets in the magazine of the Heckler & Koch were stamped "law enforcement."

Fingerprint technician Tamara Armatis obtained fingerprints from the window, a sliding glass door, some objects inside the home, and a fingerprint and palm print from the lawn chair.

October 31, 2010 Murder of Devin Topps

On October 30, 2010, Kentridge High School senior Jose Gomez invited friends to a Halloween party in the garage of his parents' house. Approximately 40 to 50 people attended the party including recent Kentridge High School graduate Devin Topps and his friends Antonio Brown, Leon Howard, and Austin Daniels.

Topps and his friends arrived at the party at approximately 11:00 p.m. Topps had received a scholarship from Eastern Washington University and planned to play football beginning winter quarter. Topps wore an old football uniform as his costume. Topps and his friends spent several hours at the party in the garage talking to friends and dancing.

2

Marlit Vela and her friend Vanessa Quiroz arrived at the party around midnight. Vela and Quiroz were not Kentridge students and "didn't know anybody" at the party. But their friends Hugo Vaca-Valencia, Israel Guzman, and David Gonzalez arrived a bit later with Jorge Luis Lizarraga.[2] When Vaca-Valencia, Guzman, David Gonzalez, and Lizarraga arrived, Vela and Quiroz went outside to join them. Vela knew Guzman and had met Vaca-Valencia and David Gonzalez several times. Vela had seen Lizarraga "a few times before" at other parties but met him for the first time that night. The group stood in a circle at the end of the driveway "so we could just talk."

At approximately 2:00 a.m., Topps and his friends decided to leave the party. As he was leaving, Topps stopped to talk to Emily Dugan. Topps agreed to walk Dugan to her car to get her cell phone and escort her back to the party. As Topps and Dugan walked past the group at the end of the driveway, someone told Topps he looked "ridiculous" in his football costume. Topps "just brushed it off and kept walking" to Dugan's car.

Vela said that as Topps walked past the group at the end of the driveway on his way back to the garage, someone made another comment about his costume and Topps "got mad." Vela testified Topps "turned around and went out to the street and started saying, let's do this, let's fight." Vela said she was standing between Topps and Vaca-Valencia and tried "to hold [Vaca-Valencia] back," but Topps and Vaca-Valencia began "wrestling." Vela testified that "a minute or so" later when Topps was "sort of on top of [Vaca-Valencia]," Lizarraga pulled out a gun, shot "up in the air three times," then "walked towards where [Topps] was and just shot him . . . in the back." Vela testified

---

[2] We refer to Jorge Lizarraga by his last name throughout the opinion.

3

that after shooting Topps, Lizarraga "went out back to the street and shot up two more times in the air."

Kent Police Officer Ken Clay arrived at approximately 2:10 a.m. Officer Clay and the paramedics attempted to resuscitate Topps but were unsuccessful.

Investigation

Kent Police Officer Doug Whitley found nine .40 caliber shell casings and one unfired .40 caliber bullet on the ground at the end of the driveway. Officer Clay also found a front car bumper with a license plate. Someone in the crowd told Officer Clay the bumper "might be the shooter's bumper from their car." The license plate was for a 1997 black Honda Civic Coupe. The registered owner told the police that she sold the car to her brother David Gonzalez several months earlier.

Kent Police Officer Amanda Quinonez talked to Topps's friends Daniels and Howard immediately after the shooting. Daniels was "highly escalated" but was able to give a description of the shooter. Daniels described the shooter as "a Mexican male between the ages of 18 to 20 years old," five feet nine to ten inches tall, with "a tattoo or a scar, some kind of mark on his face," and "either a mustache or a goatee or some kind of facial hair, not a full beard." Daniels said the shooter was wearing a long white t-shirt and jeans and maybe wore earrings.

Based on Daniel's description, at 2:33 a.m. on October 31, Kent Police Officer Ian Warmington detained a person later identified as Samuel Lizarraga. Daniels and Howard told police Samuel was not the shooter but "he may have been involved in part of the argument that led up to [the shooting]."

Samuel Lizarraga agreed to talk to the officers at the police station. Samuel was at the police station from 2:38 a.m. to 4:12 a.m. Samuel agreed to give a taped statement.

Samuel told police he went to the Halloween party with his girlfriend Elizabeth Contreras and his sister Carmen Lizarraga.[3] Samuel said he saw his cousin Jorge Lizarraga at the party but did not talk to him. Samuel said he knew David Gonzalez and thought he saw his black Honda parked near the location of the party that night.

Police detectives interviewed Carmen Lizarraga. Carmen told police she went to the Halloween party with her brother and his girlfriend. Carmen denied seeing her cousin Jorge Lizarraga at the party. Carmen said she was inside the garage with Samuel when the gunshots were fired.

Samuel and Carmen consented to a search of their cell phones. Lizarraga sent Carmen and Samuel several text messages the afternoon of October 30 about the location of different parties. One text message states, "Ima be with David." Just after midnight on October 31, Carmen sent a text to Lizarraga about the location of the Halloween party at Jose Gomez's house.

After the shooting, Lizarraga called Samuel on his cell phone four times: at 2:15 a.m., 2:16 a.m., 2:17 a.m., and 2:19 a.m. Samuel answered the call at 2:19 a.m. and spoke to Lizarraga for 41 seconds. While Samuel was at the police station, Lizarraga called Samuel ten times, and at 2:50 a.m., Lizarraga sent a text message to Samuel.

---

[3] We refer to Samuel Lizarraga and Carmen Lizarraga by their first names for purposes of clarity.

The text message states, "Hey Foo what's happening are you ok? Answer or call Carmen is in Tukwila. Don't say nothing swear that you know nothing."[4]

When confronted with the cell phone messages, Carmen admitted she saw Lizarraga that night at the Halloween party. Carmen also told Kent Police Detective Gerald Gee that she believed Vela and Quiroz were outside when the shooting occurred.

On November 4, Detective Gee and Detective Tim Ford interviewed Vela. Vela identified Jorge Lizarraga from a photomontage as the person who shot Topps.

The medical examiner determined Topps died of a single gunshot wound to the back. The bullet fractured two ribs, pierced his lung, and exited through his chest. Because the gun was "right up against [Topps's] back" and in close "contact with the skin," the gas from the gun barrel burned "an imprint of the muzzle of the gun" on Topps's back.

On December 14, Detective Gee received a phone call from United States Homeland Security Agent J. Bianche. Agent Bianche told Detective Gee that Jonathan Cervantes was in custody for assault and had information about the murder of Topps. Agent Bianche said Cervantes would talk to the detectives but only if "he was assured that something could be done about his current charge." Detective Gee and Detective Ford met with Cervantes the following day at the King County jail. Cervantes told the detectives he was at the Halloween party and saw who "did the shooting" but "refused to provide any details about the incident unless [the detectives] were able to work out a deal on his assault 2 case."

---

[4] During his testimony, Samuel testified the text that Lizarraga sent to him after the shooting while he was in police custody states, "Hey, bro, what's going on? Are you okay? Answer or call Carmen. She's in Tukwila. Don't say anything to the cops. You don't know anything."

On December 17, Detective Gee, a King County deputy prosecutor, and Agent Bianche met with Cervantes. The prosecutor told Cervantes the State could not "make any promises" about his pending assault charge. "Although we were unable to make any promises to him, [Cervantes] agreed to speak to us." Cervantes said he went to the Halloween party with Vaca-Valencia, David Gonzalez, and Richardo Covarrubias Gonzalez, and he saw Vela and Quiroz at the party. Cervantes said he did not know Jorge Lizarraga.

According to Cervantes, Vaca-Valencia and Topps were fighting when Vaca-Valencia "pulled out a semi-automatic gun and shot [Topps]." Cervantes said he did not know whether Topps was on top of or below Vaca-Valencia when the gun was fired or where Topps was shot, but he saw blood on his chest. Cervantes said that after Topps was shot, he heard two additional rounds of gunshots from where Richardo Gonzalez was standing. Cervantes said he saw Richardo Gonzalez with a gun earlier that night but the other round of gunshots came from a black male he thought was a friend of Topps. Cervantes refused to provide a sworn or taped statement.

After talking to Cervantes, detectives interviewed Vela again. Vela said she never saw Vaca-Valencia with a gun. Vela told the detectives Vaca-Valencia did not shoot Topps.

On December 21, a Covington police officer contacted Detective Gee about a burglary suspect, Luis Garcia, who said he had information about the shooting. Detective Gee interviewed Garcia that same day. Garcia told Detective Gee that he was not at the Halloween party but he was a friend of Jorge Lizarraga. According to Garcia, Lizarraga told him that he "shot some fool" at a Halloween party. Lizarraga told

7

Garcia that while he was at the party, "a guy" dressed as a football player "start[ed] bumping people around and asking people if they want[ed] to fight." Lizarraga told Garcia that Vaca-Valencia got into a fight with the guy dressed as a football player, and that when they landed on the black Honda, the bumper to fell off. Lizarraga said he "pulled out his gun" and began pistol-whipping the guy dressed as a football player and "accidentally pulled the trigger and shot [him] in the back."

Garcia told Detective Gee that Lizarraga still had the gun he used to shoot the guy dressed as a football player. Garcia said he saw Lizarraga with the gun earlier that day at the King's Arms Motel in Des Moines. Garcia said the gun was a black .40 caliber "Glock" that belonged to a "police officer." Garcia told Detective Gee that Lizarraga had been living at the motel for the past month with his cousin "Angel," and Angel drove a light gray Chevy Impala or Chevy Malibu.[5]

Kent Police Detective Brendan Wales went to the King's Arms Motel. Detective Wales confirmed there was a gray 2004 Chevy Malibu in the parking lot and the car was registered to Angel Higuera. While waiting for other officers to arrive, three people got into the Chevy Malibu and drove away. After a lengthy pursuit, the police arrested Lizarraga. During a search incident to arrest, detectives located a cell phone and a key

---

[5] The certificate of probable cause states, in pertinent part:

According to Garcia, the day after the shooting, Jorge [Lizarraga] called him and told him to watch the news because he "shot some fool". Garcia stated that Jorge told him that he went to the party with "David", "Hugo", "Turbo," "Baby Locs" and his cousins and a physical fight ensued. He said he accidentally shot a guy while pistol-whipping him. According to Garcia, Jorge gave him a detailed description of events and showed him where everything happened, while showing him the news broadcast regarding the case.

Garcia also told detectives that Jorge showed him the gun on the day that Jorge told him about the shooting. Garcia described Jorge's gun as being black in color. Garcia believed the gun was a Glock. Garcia also said the words "made in Germany" were inscribed. Garcia also recalls the words "law enforcement" [sic] believed that the gun was a police officer's gun and said it was a 40 caliber.

Garcia also reported that Jorge still had possession of the gun and he (Garcia) had last seen it around 12:00 p.m. that afternoon at the King's Arms Motel in Des Moines.

8

to King's Arms Motel room 356. The police obtained a warrant to search the cell phone and the motel room.

During the search of the motel room, police officers found a Heckler & Koch .40 caliber semiautomatic handgun and a Smith & Wesson 9 mm handgun. The serial number on the Heckler & Koch .40 caliber handgun matched the serial number of the gun stolen from Washington State Trooper Keays. The serial number on the Smith & Wesson 9 mm handgun matched a gun reported stolen during a residential burglary on November 8. Police officers also found several boxes of .40 caliber and 9 mm ammunition.

During the search of the cell phone, police found three photographs of Lizarraga on December 10, 2010. In the photographs, Lizarraga is holding the Heckler & Koch .40 caliber semiautomatic handgun.

Criminal Charges

On December 23, 2010, the State charged Lizarraga with unlawful possession of a firearm in the first degree. The certificate of probable cause describes the interview with Garcia, the search of the King's Arms Motel, the car chase, the arrest of Lizarraga, and the search of the motel room.

On February 2, 2011, Detective Gee interviewed Christian Cervantes, the brother of Jonathan. Christian Cervantes did not witness the shooting. Christian told Detective Gee that he "had been at various parties and had overheard people talk about the shooting, and heard Jorge's name or Jorge Lizarraga's name as being the shooter."

Forensic analysis determined the fingerprints found on the lawn chair and the coin jar at Trooper Keays' house matched Lizarraga's fingerprints. Washington State

9

Patrol Crime Lab (WSPCL) firearm and tool mark expert Kathy Geil determined the Heckler & Koch .40 caliber handgun found in the King's Arms Motel room matched the shell casings the police located after Topps was shot and killed. The markings from the unfired bullet found at the end of the driveway were consistent with having been "cycled through" the same gun. The muzzle of the Heckler & Koch .40 caliber semiautomatic handgun matched the muzzle imprint the medical examiners identified on Topps's back.

On March 31, 2011, the State filed an amended information charging Jorge Lizarraga with intentional and felony murder in the second degree and unlawful possession of a firearm in the first degree. Detective Gee signed the "Certification for Determination of Probable Cause" under oath. The Certification for Determination of Probable Cause describes in detail the investigation. The certificate of probable cause describes the interview with Vela as follows:

> On 11-04-10 Detectives interviewed witness, Marlit Vela. Marlit told detectives that she was outside standing in the driveway, with [JORGE LUIS] LIZARRAGA, David [Gonzalez], Hugo Vaca-Valencia, [Guzman] and two other unknown males when the altercation with Devin [Topps] started. According to Marlit, Hugo said something to Devin and Devin started to "go for him." Marlit was in the middle and tried to hold Hugo back. After Hugo and Devin began to fight, Marlit moved away towards the street. While she was in the street, Marlit observed LIZARRAGA pull a gun out from his pocket and fire three shots into the air. Marlit then watched as LIZARRAGA rapidly walked towards Devin, as Devin was on the ground fighting with somebody. Marlit saw LIZARRAGA point the gun at Devin and fire one shot into Devin's body. LIZARRAGA then fired two more shots into the air. Marlit selected LIZARRAGA from a 6 photo montage as the person who shot Devin. Marlit stated that the victim was still fighting with people and had someone on top of him at the time he was shot. Hugo later told her that he had Devin by the collar and Devin said, "Let me go I just got shot."
>
> Marlit also told detectives that she had met Hugo and David several months earlier and had seen LIZARRAGA with David 3-4 times. She had previously seen LIZARRAGA with a gun, which she described as a

revolver. She believed that was the same gun he had on the night of the shooting.

The certificate of probable cause describes the interview with Jonathan Cervantes and his statement that Vaca-Valencia shot Topps as follows:

> On December 17th, detectives met with Jonathan Cervantes . . . in the King County Jail. He reported that he was at the party and confirmed that Hugo Vaca-Valencia, David Gonzalez, Vanessa Quiroz and Marlit Vela were also there. Cervantes said he did not know LIZARRAGA. According to Cervantes, Hugo and Devin were in a physical fight when Hugo pulled out a semi-automatic gun and shot him. He was unsure whether Hugo was on top of the victim or whether the victim was on top of Hugo at the time of this shot. He did not know what part of the victim's body was shot although he said he saw blood on his chest. According to Cervantes, he heard two additional sets of gun shots that evening. Cervantes asked the detectives for a deal on his pending case in exchange for the above information. Marlit was re-interviewed and confirmed that she never saw Hugo with a gun and that he did not shoot Devin.

In October 2013, the State filed an amended information charging Lizarraga with murder in the second degree of Topps, residential burglary of Trooper Keays' house, theft of the Heckler & Koch .40 caliber handgun, unlawful possession in the first degree of the Heckler & Koch .40 caliber handgun, unlawful possession in the first degree of the Smith & Wesson 9 mm handgun, and possession of the stolen Smith & Wesson firearm.

The trial was scheduled to begin on October 8. On October 3, the defense moved to continue the trial date to October 23. The defense attorney argued a short continuance was necessary to arrange an interview with Luis Garcia. The State had located Garcia in Mexico and planned to call him as a witness at trial. The defense also wanted to interview Gerardo Ortiz. The State had subpoenaed Ortiz as a witness to testify about incriminating statements Lizarraga made while in custody. The defense

11

attorney also told the court his investigator was trying to locate Jonathan Cervantes. The court granted the motion to continue the trial date.

Trial

The trial began on October 23. In the opening statement, the prosecutor told the jury the evidence would show Lizarraga shot Topps with the gun he stole from Trooper Keays' house. The defense argued Lizarraga was "not the shooter." The defense attorney told the jury that no one at the Halloween party "really saw what happened," and the evidence would show there were multiple guns at the party and Lizarraga was not close enough to Topps to fire the shot that killed him.

More than 40 witnesses testified during the six-week jury trial including Topps's friends and others who attended the party, Vela, Quiroz, Samuel, Carmen, Lizarraga's girlfriend Marjorie Kramer, police detectives, WSPCL forensic scientists, and the medical examiner. Neither Luis Garcia nor Jonathan Cervantes testified at trial.

The court admitted into evidence more than 150 exhibits including the transcripts of the cell phone text messages Lizarraga sent before and after the shooting. The court also admitted into evidence the cell phone photograph of Lizarraga holding the Heckler & Koch .40 caliber handgun.[6] The defense did not call any witnesses.

Emily Dugan testified that while Topps walked her back to the party, there was a group of "six or seven guys" standing at the end of the driveway. Dugan said Topps "push[ed] . . . [s]omeone in the group" and "they started fighting." Dugan testified one

---

[6] Contrary to the assertion in appellant's brief, there is no evidence of a photograph showing Vaca-Valencia holding a gun. Lizarraga points to only the prosecutor's closing statement in support of this assertion. The record reflects the prosecutor referenced a photograph of Vaca-Valencia holding a gun during closing, but it appears the prosecutor either misspoke or there was a transcription error. During her testimony at trial, Marjorie Kramer identified the person in the other photograph as "Angel (Julio)," not Vaca-Valencia.

person was "standing like — just like watching the fight." Dugan told the jury she was standing approximately six to eight feet away when she saw the man who had been watching the fight "put his hand up" and fire three shots "towards the sky." Dugan said after she saw the man bring his arm down, she saw Topps running away. Dugan testified that as she started running toward the garage, she "heard . . . two or three more shots." Dugan testified that she heard "[s]till two or three" more gunshots when she was in the garage. Dugan described the shooter as approximately five feet eight or nine inches tall and wearing a "[b]lack North Face windbreaker, or some sort of black jacket."

Brown, Howard, and Daniels testified they were walking just ahead of Topps when the fight began. Brown said the man fighting with Topps was wearing a white t-shirt and was approximately five feet five to six inches tall. Brown testified that while Topps and the man in the white t-shirt were fighting, another person approached Topps. Brown said the man was approximately five feet eight to nine inches tall, wearing "all-black clothing," and had "slicked-back hair." Brown testified he saw the man reach into his shirt and pull out a gun. Brown testified the man shot "three or four shots in the air." Brown testified he started running and when he looked back, he saw the man shoot again and saw Topps fall to the ground.

Howard testified there was a woman in the group trying to act as a "mediator to stop what was going on." Howard described the man Topps was fighting with as "a smaller guy" wearing an unbuttoned plaid shirt with an undershirt underneath that might have been white. Howard testified that almost immediately after Topps and the man started fighting, he heard gunshots. Howard testified that he saw someone else shoot

in the air "five or six times." Howard then saw Topps fighting with a different man and the man hit Topps "with a pistol." Howard believed the gun was a revolver. Howard testified the man and Topps were "sort of fighting on the hood of a car." Howard testified Topps "was pistol-whipped a second time" by someone else and "within a second, [Topps] was shot" in the back. Howard testified the man who shot Topps in the back was wearing a white shirt. "[T]he guy that shot [Topps] was wearing a white shirt. The guy that originally attacked [Topps] was wearing a plaid shirt."

Daniels testified one of the men in the group standing at "the end of the driveway" said something to Topps, and when Daniels turned around, he saw two men "attack" Topps. Daniels testified that during the "struggle," he saw another man "lift his shirt and pull a gun out of his waistband" and shoot "four or five rounds in the air." Daniels said Topps tried to run away but he slipped and fell, putting "both hands flat in front of him on the ground, almost like he's going to go into a push-up position to catch himself." Daniels testified that "[a]t that point in time there's one more shot that I heard myself. [Topps] stands up and he looks in my face, grabs my shoulder and tells me, Austin, I got shot."

Daniels testified the man who shot Topps was "probably right around" 5 feet 10 to 11 inches tall with facial hair and wearing a white shirt. Daniels said there was "maybe a rosary type of thing around the actual shooter's neck." Daniels admitted he is "not really big on guns" but he thought the gun was "some sort of revolver" because the shooter "actually cocked it." On cross-examination, Daniels testified it was his "impression that the guy who started the fight was also the guy who shot [Topps]." Daniels said he kept "going back and forth" about whether he saw "a second weapon."

14

Daniels admitted he told police in his initial statement that he saw two guns but testified he "never told the police" he "saw two shooters[,] . . . [j]ust two guns."

Vela identified Lizarraga as the man who shot Topps. Vela testified that she saw Lizarraga walk up to Topps and shoot him once in the back. Vela told the jury she was "probably like 10 feet away from [Lizarraga]" when he fired the gun. Vela estimated less than one or two minutes elapsed between the time Lizarraga fired the first shot into the air and when he shot Topps. Vela testified she did not see anyone else with a gun at the party. Vela said Lizarraga was wearing a "white shirt under a long-sleeve [blue] and white striped shirt" and black sunglasses with "writing on the side." Vela testified that Lizarraga had acne scars on his cheeks.

On cross-examination, Vela testified Vaca-Valencia and Topps "were mainly engaged" in the fight "[b]ut there were others involved as well." Vela testified that Vaca-Valencia had a scar by his "upper cheek bone" but she was not sure whether it was on his left or right side. Vela admitted she initially told police officers that the gun Lizarraga used to shoot Topps was the same gun she saw Lizarraga with three weeks earlier and that the gun was a revolver. Vela also admitted she did not remember Lizarraga's name until after Quiroz told her. "I knew who he was, but like the name didn't pop in my head right away."

Quiroz testified she was in the garage at the time of the shooting. Quiroz said she heard three gunshots, a pause, and then three more. Quiroz testified that Vela was crying and told her "Jorge" shot Topps "in the back."

Samuel admitted he lied to police when he said his cousin Jorge Lizarraga left the Halloween party before the shooting. Samuel testified that when he arrived at the

party, he saw Lizarraga sitting in a black Honda parked in the driveway with David Gonzalez and another man he did not know. Samuel testified he did not see the shooting. Samuel remembered hearing three or four gunshots, then a pause, and then two or three more shots. Samuel testified that when he went outside after the shooting, he saw Lizarraga "jump into [the black Honda]" and drive away. Samuel said he did not see anyone with a gun at the party.

Carmen admitted she lied to the police when she said her cousin Lizarraga was not at the Halloween party. Carmen testified she was in the garage with her brother Samuel when she heard shots fired. After Carmen ran outside, she saw a "small . . . black car" pull out of the driveway "going backwards" and the front bumper fall off.

Carmen drove away from the party in a car with Vaca-Valencia and Richardo Gonzalez. Carmen testified that Vaca-Valencia had "dirt on his face and his clothes." She did not see Vaca-Valencia with a gun but said Richardo Gonzalez had a "black gun" in the car. Carmen said the gun had a "little wheel on it" and Richardo Gonzalez spun the wheel to show her that the gun was not loaded. Carmen testified that before she spoke to the police, she called Lizarraga and he told her to tell the police that "I haven't seen him or talked to him, or to not say anything."

Lizarraga's girlfriend Marjorie Kramer testified that before Lizarraga's arrest, he showed her a KOMO 4 News video about "a kid who got shot" at a Kent party. Lizarraga told Kramer, "[T]his is why we changed our phone numbers." Kramer testified that after they drove away from the King's Arms Motel and the police were following them, Lizarraga told her he "had to get rid of the gun because it was going to get traced back to him." On cross-examination, Kramer testified that Lizarraga's friends, including

David Gonzalez and "Turbo," often stopped by and spent time with them in the King's Arms Motel room.

Gerardo Ortiz testified he was in custody in the King County jail in December 2010 and January 2011. Ortiz testified Lizarraga talked to him several times about the shooting. Ortiz testified he took "little notes" about what Lizarraga told him. Ortiz admitted he took notes about what Lizarraga said in an effort to secure a "deal."

Ortiz testified Lizarraga told him that he shot Topps. Ortiz testified Lizarraga said he "fired towards the sky" and then "shot at the victim." Ortiz testified Lizarraga also told him that he stole the gun he used in the shooting from the house of a "police officer." Ortiz testified Lizarraga said he cleaned the gun after shooting Topps to "[c]lean off any fingerprints and stuff on it" and "hid it" in the motel room.

King County Sheriff's Office latent fingerprint examiner Cheri Mahar testified about the comparison of Lizarraga's fingerprints to the latent prints obtained from the chair and coin jar at Trooper Keays' house. Mahar testified Lizarraga's fingerprints matched the prints on the chair that was leaning against the house and the coin jar in the bedroom closet.

The medical examiner testified about the shot that killed Topps and explained why the muzzle of the gun left an impression on Topps's back. The medical examiner testified, in pertinent part:

> The actual entrance defect where the bullet actually pierces the skin is a hole here. Around the hole is this area of black discoloration. You see it's all the way circumferential around that wound. . . . [W]hen a muzzle of a gun is right up against the skin, you've got smoke which is completely burned powder, the stippling which is that partially burned powder, the bullet, and even some flame which will go right into the body. It's tight up against the body. Now, we may around in this peripheral area

17

see a little bit of soot material, and there may actually be some burning of the tissue because of the flame that happens, too.

. . . And you could see the edge of the wound, black particulate matter, and you can see burning artifact of the tissue itself. So that's added evidence that there is contact-range fire, because you have all of those elements of the contact wound. You have the soot. You have the burning of the skin.

In addition, in this case, around the periphery to the outside you could see kind of an impression of a circumferential circle outside of the wound itself. And you also have this round circle out here removed from the wound itself. And I guess it's a sideways-shaped U of red discoloration even further removed from the wound. These are components of the muzzle of that particular gun.

. . . .

. . . [S]ince [the gun is] tight up against the body, everything is going to go into the body. And that includes about a liter or more of gas. So what's going to happen is the skin is actually going to be bulged out and pushed against that barrel of the gun as the gun is being fired. It happens in a fraction of a second. But in that time, it's matched up against the muzzle of the gun. So that impression is imprinted into the skin.

WSPCL firearm and tool mark expert Kathy Geil testified that "[a]ll nine" of the cartridge casings recovered from the location where Topps was shot "had been fired through" the Heckler & Koch .40 caliber semiautomatic handgun found in the King's Arms Motel room. Geil testified the unfired cartridge "had been chambered in [the same Heckler & Koch handgun]." Geil testified the Heckler & Koch .40 caliber semiautomatic handgun was the "same shape and design" as the "muzzle imprint" on Topps's back.

In closing, the prosecutor argued the evidence established beyond a reasonable doubt that Lizarraga was guilty of intentional and felony murder. The prosecutor pointed to the physical evidence and testimony that corroborated Vela and proved Lizarraga shot Topps in the back with the Heckler & Koch .40 caliber semiautomatic handgun that he stole from Trooper Keays' home.

The defense argued the evidence showed there was "more than one gun. And if there's more than one gun, then there's a possibility of more than one person having a

gun." Defense counsel emphasized the inconsistent eyewitness testimony about the location of the shooter, what the shooter was wearing, and how many shots were fired. The defense attorney argued the evidence showed someone else could have brought the gun to the party and used it to shoot Topps. Defense counsel argued that "even if" Lizarraga stole Trooper Keays' gun, anyone who visited him at the motel room including David Gonzalez and Vaca-Valencia had access to the gun.

The jury convicted Lizarraga as charged of murder in the second degree, residential burglary, theft of a firearm, unlawful possession in the first degree of the Heckler & Koch .40 caliber handgun, unlawful possession in the first degree of a Smith & Wesson 9 mm handgun, and possession of a stolen firearm. By special verdict, the jury found Lizarraga was armed with a firearm at the time of the commission of the crime of murder in the second degree. The court imposed a standard range sentence with a mandatory consecutive 60-month firearm enhancement sentence. Lizarraga appeals.

## ANALYSIS

<u>Right to Present a Defense</u>

Lizarraga contends the court violated his constitutional right to present a defense by denying his motion to introduce the out-of-court hearsay statement of Jonathan Cervantes that Vaca-Valencia shot Topps. We review an alleged denial of the constitutional right to present a defense de novo. <u>State v. Jones</u>, 168 Wn.2d 713, 719, 230 P.3d 576 (2010).

Whether rooted in the Compulsory Process Clause of the Sixth Amendment or the Due Process Clause of the Fourteenth Amendment, the United States Constitution

guarantees a criminal defendant " 'a meaningful opportunity to present a complete defense.' " Holmes v. South Carolina, 547 U.S. 319, 324, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006)[7] (quoting Crane v. Kentucky, 476 U.S. 683, 690, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986)). The fundamental due process right to present a defense is the right to offer testimony and compel the attendance of a witness.

> "[I]n plain terms the right to present a defense[ is] the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law."

Taylor v. Illinois, 484 U.S. 400, 410, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988) (quoting Washington v. Texas, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967)).

However, there is a significant difference between the Compulsory Process Clause and most rights protected by the Sixth Amendment. The right to compulsory process is not absolute. "[M]ore than the mere absence of testimony is necessary to establish a violation of the right." United States v. Valenzuela-Bernal, 458 U.S. 858, 867, 102 S. Ct. 3440, 73 L. Ed. 2d 1193 (1982). The availability of the Sixth Amendment Compulsory Process Clause "is dependent entirely on the defendant's initiative." Taylor, 484 U.S. at 410.

> Most other Sixth Amendment rights arise automatically on the initiation of the adversary process and no action by the defendant is necessary to make them active in his or her case. While those rights shield the defendant from potential prosecutorial abuses, the right to compel the presence and present the testimony of witnesses provides the defendant with a sword that may be employed to rebut the prosecution's case. The decision whether to employ it in a particular case rests solely with the

---

[7] Internal quotation marks omitted.

defendant. The very nature of the right requires that its effective use be preceded by deliberate planning and affirmative conduct.

Taylor, 484 U.S. at 410.[8]

The defendant's right to present testimony is also not absolute. "The accused does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." Taylor, 484 U.S. at 410; see also Jones, 168 Wn.2d at 720. The defendant's right to present a defense is subject to "established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." Chambers v. Mississippi, 410 U.S. 284, 302, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973). "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." United States v. Scheffer, 523 U.S. 303, 308, 118 S. Ct. 1261, 140 L. Ed. 2d 413 (1998). Evidentiary "rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.' " Scheffer, 523 U.S. at 308 (quoting Rock v. Arkansas, 483 U.S. 44, 55, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987)). Accordingly, a defendant's interest in presenting relevant evidence may " 'bow to accommodate other legitimate interests in the criminal trial process.' " Scheffer, 523 U.S. at 308 (quoting Rock, 483 U.S. at 55).

Although the longstanding rule against the admission of hearsay evidence "may not be applied mechanistically," that was not so in this case. Chambers, 410 U.S. at 302. The record does not support Lizarraga's argument that the trial court violated his constitutional right to present a defense by denying the motion to admit the out-of-court hearsay statement of Cervantes.

---

[8] Footnote omitted.

The State filed the amended information charging Lizarraga with murder in the second degree and the certificate of probable cause that sets forth the interview with Jonathan Cervantes and the exculpatory statement that someone else shot Topps on March 31, 2011. The defense attorney did not attempt to interview Cervantes until January 2013. When the defense attorney and the prosecutor went to the detention facility to interview Cervantes in January 2013, they learned he had been released from custody.

The record establishes Cervantes was not deported to Mexico until July 2013. But the defense made no attempt to interview Cervantes again until right before trial in October 2013. Defense counsel also took no steps to depose or otherwise preserve Cervantes' testimony and did not request a material witness warrant until the day before trial began on October 23.

On November 15, the prosecutor discovered the material witness warrant had not been recorded "online." The prosecutor immediately informed the defense attorney and sent another certified copy of the warrant to the clerk's office. The prosecutor also sent an alert to law enforcement concerning the outstanding material witness warrant for Cervantes.[9]

On the second to last day of trial in December, the defense sought to admit the out-of-court hearsay statement made by Cervantes. The defense submitted the case

---

[9] On November 18, the prosecutor informed the court that the material witness warrant for Cervantes had been filed but not posted online until November 15.

> I received a call on Friday morning, round about, but eventually from King County Data indicating that a detective had contacted them about looking for Mr. Cervantes and had noted the warrant itself was not online. . . . It's my understanding that the warrant was hand-walked over to the clerk's office on October 23rd — it was walked — when the Court signed it, it was delivered to the clerk's office.
>
> A representative of the clerk's office said he sent a certified copy of the warrant on October 23rd. It's unclear to me what happened. We immediately got them a new copy. It was online as of some time Friday morning.

report of Detective Gee describing the December 2010 interview with Cervantes.[10] Defense counsel argued the court should allow him to examine Detective Gee and introduce the out-of-court hearsay statement of Cervantes that Vaca-Valencia shot Topps.

Defense counsel conceded Cervantes' out-of-court statement was being offered for the truth and inadmissible under the hearsay rules. The defense argued "notwithstanding the hearsay nature of the testimony," the right to present a defense "should prevail over the state's hearsay rule."

The State opposed the motion. The prosecutor pointed out that in December 2010, Cervantes was charged with "a significant assault and intimidating a witness charge" and facing a "significant prison term." The prosecutor argued that because Cervantes would not swear to his statements about the shooting "unless he was promised something in return," that "goes to the reliability of the State's belief or lack

---

[10] The offer of proof states, in pertinent part:

The defendant offers to prove by Detective Gerald Gee, Kent Police Department, as follows:

"[On December 17, 2010] Detective Eades and I responded to the King County Jail and contacted Jonathan Cervantes. Also on location were Jessica Berliner from the King County Prosecutors [sic] Office and Agent Bianche from Homeland security. Jonathan was advised that we could not make any promises nor were we able to talk about his pending assault case. Although we were unable to make any promises to him, Jonathan agreed to speak to us. Jonathan stated that he was at the party and confirmed that Hugo [Vaca-Valencia], [Richardo Gonzalez], David [Gonzalez], Vanessa [Quiroz] and Marlit [Vela] were also there. Jonathan said he did not know Jorge [Lizarraga]. Jonathan went on to say that Hugo and Devin [Topps] were in a physical fight when Hugo pulled out a semi-automatic gun and shot Devin. Jonathan was unsure whether Hugo was on top of the victim or under the victim at the time of the fatal shot. Jonathan did not know what part of the victim's body was short [sic] although he said he saw blood on his chest. After the victim was shot, Jonathan heard two additional sets of gun shots. One set he believed came from the area where [Richardo Gonzalez] was standing. Jonathan had seen [Richardo Gonzalez] with a gun earlier that night. Jonathan said the other set of gunshots came from what he thought was a black male. Jonathan was not certain but thought the black male was a friend of the victim. The black male was standing in the middle of the street when he fired shots into the air. Jonathan refused to provide a taped statement."

23

thereof of his particular hearsay statement." The prosecutor asserted the statements Cervantes made were unreliable and, "in fact, . . . entirely inconsistent with all the facts."

"[W]ith regard to the delay in putting [the October 2013 material witness warrant] online," the prosecutor described the multiple efforts the State and law enforcement made to locate Cervantes and how the State "enlisted the help of the federal government to look for [Cervantes]." The prosecutor told the court that federal agents contacted Cervantes' brother Christian Cervantes and Cervantes' parents. Cervantes' brother and parents told the agents that Cervantes was in Mexico and provided a phone number, and "an agent was able to speak to Jonathan Cervantes in Mexico. So they did attempt every effort to locate him."

The court denied the request to admit the hearsay statement. The court ruled, "[N]othing about the statement of Mr. Cervantes . . . indicates whatsoever that the statement is reliable" and "every indication that it may be unreliable." The court concluded the "unchallenged and unreliable statement" was "far outweighed by the possibility of unfair prejudice, confusion of the issues, and misleading of the jury."

> Furthermore, it's concerning to this Court that if I were to frankly disregard the evidence rules and let in the statement in support of the constitutional challenge, that the statement would go completely unchallenged. There is no practical way that the opponent of the statement, the State of Washington, would have to challenge the statement, to truly test the credibility of the speaker, Mr. Cervantes, or proper sufficient evidence so that the jury could properly weigh whether they are really going to consider the statement or how much they are going to consider of the statement.

Chambers and Jones do not support admission of the hearsay statements. First, unlike this case, Chambers involved the exclusion of evidence under state evidentiary statutes that would have been admissible in most states. Chambers, 410 U.S. at 303. A state law prohibited a party from impeaching its own witness and a state hearsay rule

excluded the testimony of three persons to whom that witness had confessed. Chambers, 410 U.S. at 295-98.

The defendant in Chambers was accused of murdering a police officer. Shortly after the crime, another person told several friends that he had killed the officer. He later made a sworn confession to the crime. Chambers, 410 U.S. at 285-87. At trial, the defendant called the person who had previously confessed to the murder as a witness. Chambers, 410 U.S. 287-88. When the witness repudiated his earlier sworn statement confessing to the murder, the defendant was denied permission to examine him as an adverse witness based on the state's "voucher" rule. Chambers, 410 U.S. at 291-92, 295-96. And because the state hearsay rule did not include an exception for statements against penal interest, the defendant was not allowed to introduce evidence that the witness had made self-incriminating statements to three other persons. Chambers, 410 U.S. at 292-93.

The Supreme Court held that "the exclusion of [certain] critical evidence, coupled with the State's refusal to permit [the defendant] to cross-examine [the witness], denied him a trial in accord with traditional and fundamental standards of due process." Chambers, 410 U.S. at 302. The court noted the excluded hearsay statements that were made "spontaneously to a close acquaintance shortly after the murder" and "corroborated by some other evidence in the case . . . bore persuasive assurances of trustworthiness and thus [were] well within the basic rationale of the exception for declarations against interest." Chambers, 410 U.S. at 300-02. Further, the witness was present in the courtroom and "could have been cross-examined by the State, and his demeanor and responses weighed by the jury." Chambers, 410 U.S. at 301.

25

The court confined its holding to the "facts and circumstances" presented in the case and emphasized that the ruling did not "signal any diminution of the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures." Chambers, 410 U.S. at 302-03.

> In reaching this judgment, we establish no new principles of constitutional law. Nor does our holding signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures. Rather, we hold quite simply that under the facts and circumstances of this case the rulings of the trial court deprived [the defendant] of a fair trial.

Chambers, 410 U.S. at 302-03.

In Jones, the trial court excluded evidence that the victim had consented to sex during a drug-induced sex party. Jones, 168 Wn.2d at 717-18. The court refused to allow the defendant in a rape case to testify or cross-examine witnesses about the sexual encounter as barred by Washington's rape shield statute, RCW 9A.44.020. Jones, 168 Wn.2d at 717-18. The court held the rape shield statute did not apply and could not be used to bar the defendant from testifying or cross-examining witnesses about what occurred at the party. Jones, 168 Wn.2d at 723. The Washington Supreme Court reversed. Jones, 168 Wn.2d at 725. The court concluded there was no State interest compelling enough to preclude introduction of such evidence and that excluding it violated the defendant's right to present a defense. Jones, 168 Wn.2d at 721.

We hold the court did not violate Lizarraga's constitutional right to present a defense by denying his motion to admit the out-of-court hearsay statement of Jonathan Cervantes. The hearsay rule has "long been recognized and respected by virtually every State" and "is based on experience and grounded in the notion that untrustworthy evidence should not be presented to the triers of fact." Chambers, 410 U.S. at 298. As

the Washington Supreme Court stated in State v. Finch, 137 Wn.2d 792, 825, 975 P.2d 967 (1999), allowing inadmissible hearsay testimony "places the [witness's] version of the facts before the jury without subjecting the [witness] to cross-examination," depriving the State "of the benefit of testing the credibility of the statements" and denying the jury "an objective basis for weighing the probative value of the evidence." The court held the defendant's right to compulsory process did not allow him to admit hearsay testimony and "escape cross-examination." Finch, 137 Wn.2d at 825. The "right to admit evidence pursuant to [the defendant's] right to compulsory process is subject to established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." Finch, 137 Wn.2d at 825.

For the first time on appeal, Lizarraga contends that because Cervantes was deported without notice to the defense, the court erred in denying his motion to introduce the out-of-court hearsay statement of Cervantes as a sanction. The record does not support his argument. The record shows the State did not impermissibly interfere with Lizarraga's right to call Cervantes as a witness at trial.

"[T]he '[p]ower to regulate immigration is unquestionably . . . a federal power.' " Chamber of Commerce of the U.S. v. Whiting, 563 U.S. 582, 131 S. Ct. 1968, 1974, 179 L. Ed. 2d 1031 (2011)[11] (quoting De Canas v. Bica, 424 U.S. 351, 354, 96 S. Ct. 933, 47 L. Ed. 2d 43 (1976)).

To establish the government's deportation of a witness constitutes a constitutional violation, the defendant must show the government acted in bad faith and prejudice. Specifically, without first giving defense counsel a chance to interview the witness, the government deported the witness despite having "information suggesting

[11] Some alterations in original.

27

that he could offer exculpating evidence." United States v. Leal-Del Carmen, 697 F.3d 964, 969-70 (9th Cir. 2012).

Neither the record nor the case law Lizarraga cites, Leal-Del Carmen and People v. Valencia, 218 Cal. App. 3d 808, 267 Cal. Rptr. 257 (1990), supports finding bad faith.

In Leal-Del Carmen, federal border agents detained Mexican nationals and arrested the defendant for alien smuggling. Leal-Del Carmen, 697 F.3d at 967-68. During videotaped interviews with the federal agents, three of the witnesses identified the defendant either as the leader of the smuggling ring or as someone with whom they made travel arrangements. Leal-Del Carmen, 697 F.3d at 968. The fourth witness told the federal agents that the defendant " 'did not give orders.' " Leal-Del Carmen, 697 F.3d at 968. The government kept the three witnesses as material witnesses but deported the fourth witness before the defendant was arraigned or represented by counsel. Leal-Del Carmen, 697 F.3d at 969. "[The defendant's] lawyer thus had no opportunity to interview [the witness], and the government didn't disclose that [the witness] had provided exculpatory testimony." Leal-Del Carmen, 697 F.3d at 969. The court held the government acted in bad faith by deporting a witness it knew could give exculpatory evidence "before defense counsel has been retained or appointed and has had a fair opportunity to interview him." Leal-Del Carmen, 697 F.3d at 970-71.

> Once the government is aware that an alien has potentially exculpatory evidence, it must treat that person as a material witness and give defense counsel the opportunity to interview him and make a reasoned determination whether to seek his retention pending trial. This means the witness may not be deported before defense counsel has been retained or appointed and has had a fair opportunity to interview him.

Leal-Del Carmen, 697 F.3d at 970.

The court rejected the government's evidentiary argument that the videotaped statement of the fourth witness was inadmissible hearsay for two reasons. First, "the tape was admissible under the forfeiture by wrongdoing hearsay exception," and the testimony constituted "circumstantial guarantees of trustworthiness" under the federal rules of evidence. Leal-Del Carmen, 697 F.3d at 974.[12]

As in Leal-Del Carmen, in Valencia, a material witness was deported a few days later without prior notice to the defendant. Valencia, 218 Cal. App. 3d at 812. The prosecutor "gave no explanation for its failure to give [the defendant] or his counsel advance notice of [the] deportation." Valencia, 218 Cal. App. 3d at 827. On appeal, the court affirmed the trial court's dismissal of a firearm charge, concluding the witness's material and favorable testimony was clearly known to the State and the State acted in bad faith by failing to give the defendant advance notice that the witness was going to be deported. Valencia, 218 Cal. App. 3d. at 813, 826-27.

Lizarraga cannot show bad faith. Unlike in Leal-Del Carmen, the State notified the defense in March 2011, more than two years before trial, that Lizarraga told detectives that Vaca-Valencia shot Topps, and defense counsel had the opportunity to interview Jonathan Cervantes.

On March 31, 2011, the State charged Lizarraga with murder in the second degree and unlawful possession of a firearm in the first degree. The Certification for Determination of Probable Cause identifies Jonathan Cervantes as a potential material witness. The certificate of probable cause describes the statement of Cervantes that someone else shot Topps. The certification states detectives spoke to Cervantes in December 2010 while he was in the King County jail and Cervantes said Vaca-Valencia

_____

[12] Internal quotation marks omitted.

shot Topps. Nearly two years later, in January 2013, the defense attorney went to the federal detention facility in Tacoma to interview Cervantes. Unbeknownst to the defense attorney and the prosecutor, Cervantes had been released from custody.

The defense attorney "did not try to find [Cervantes] again" until mid-September 2013. On September 19, the defense attorney contacted the prosecutor to ask if the State had any current contact information for Cervantes. On September 30, the prosecutor learned Cervantes had been deported on July 23, 2013 and immediately notified defense counsel.

During a hearing on October 3, 2013 on the defense motion to continue the trial date, the attorney informed the court that Cervantes had been deported.

> The third issue is Jonathan Cervantes. Jonathan Cervantes, on the — contemporaneously with this — the incident that Mr. Lizarraga is on trial for — Cervantes was present at the scene and told the police that he saw who shot the victim and it was not Mr. Lizarraga.
> Mr. Cervantes was here for a while. I went down to interview him in federal custody in Tacoma. The prosecutor met me there and we planned to interview him and learned that he had been released; to where I'm not sure, but I did not try to find him again until the middle of last month and learned that he had been deported just a couple of months before that.
> So during the delay between when we first tried to find him and now, he was deported to Mexico.
> I really need to talk to this guy. My investigator, Julie Gonzales, is really good at finding people in Mexico and elsewhere. I think we can find him.

Defense counsel told the court that if his investigator was able to locate Cervantes, "I am hoping that [the State] can arrange an immigration parole." In response, the prosecutor told the court, "I want defense to understand I don't — do not believe we can rely on the same mechanism to get [Cervantes] back into the country — under my understanding." Nonetheless, the prosecutor stated, "[T]hat's not the only

way that somebody can appear and testify at trial. We can take a perpetuation deposition. [Cervantes] can potentially testify by Skype."[13]

The day before the trial began on October 23, the defense attorney asked the court to issue a material witness warrant for Cervantes. The defense attorney stated, in pertinent part:

> The Court may recall Jonathan Cervantes who is the guy who told police and told the Prosecutor that Hugo Vaca-Valencia was the shooter. And that Cervantes saw this happen at the party. [Vaca-Valencia] admitted being at the party, but denied knowing anything else about it in substance.
>
> [Cervantes] is the witness that I tried to interview in January of [2013]. He was in federal custody, so I have been told. I met the Prosecutor at the detention facility in Tacoma. We learned then that Mr. Cervantes had been released from custody to a location that wasn't disclosed to me.
>
> By the time I got around to trying to find [Cervantes] again, I learned that on July 23 of [2013] he had been deported to Mexico through El Paso. And since learning that on September 19 of [2013], I have been trying to find Mr. Cervantes and I've had our investigator trying to find him. We are frankly not sure where he is. We think he might be back here. But whether he's in Mexico or not, we are not quite certain.
>
> But if he is here, I request the Court to issue a material witness warrant for Jonathan Cervantes now so that if he is here, we can have police resources look for him.

Because there is no evidence the State played any part or acted in bad faith in the deportation of Cervantes, the record establishes no violation of the constitutional right to compulsory process.[14]

---

[13] Skype is a live video chat and long-distance voice calling service. The case Lizarraga cites as additional authority is distinguishable. In State v. Cayetano-Jaimes, No. 70547-4-I, 2015 WL 5547450 (Wash. Ct. App. Sept. 21, 2015), the court refused to allow a defendant to present testimony by telephone.

[14] For the first time on appeal, Lizarraga argues that even if we disagree that "Cervantes's identification of another person as the shooter should have been admitted for its truth, at the very least it should be admissible to show the investigation was incomplete." Lizarraga relies on Alvarez v. Ercole, 763 F.3d 223 (2d Cir. 2014). In Alvarez, the defense attorney sought to cross-examine the lead detective about another suspect to demonstrate "that the police investigation into the murder was flawed." Alvarez, 763 F.3d at 231-32. We will not reverse the trial court's decision based on an argument raised for the first time on appeal. State v. Kirkman, 159 Wn.2d 918, 926, 155 P.3d 125 (2007).

Jury Verdict on Murder in the Second Degree

Lizarraga contends the conviction for murder in the second degree violated his right to a unanimous jury verdict because the court instructed the jury that it "need not be unanimous" as to the means by which he committed the crime.

Under the Washington State Constitution, criminal defendants have a right to a unanimous jury verdict. CONST. art. 1, § 21; State v. Ortega-Martinez, 124 Wn.2d 702, 707, 881 P.2d 231 (1994). In certain cases, the right to a unanimous jury trial "includes the right to express jury unanimity on the means by which the defendant is found to have committed the crime." Ortega-Martinez, 124 Wn.2d at 707;[15] see also State v. Owens, 180 Wn.2d 90, 95, 323 P.3d 1030 (2014).

But an alternative means crime sets forth "distinct acts that amount to the same crime." State v. Peterson, 168 Wn.2d 763, 770, 230 P.3d 588 (2010).[16] Therefore, it is well established that unanimity is not required where sufficient evidence supports each of the alternative means of committing the crime. Ortega-Martinez, 124 Wn.2d at 707-08.

> The threshold test governing whether unanimity is required on an underlying means of committing a crime is whether sufficient evidence exists to support each of the alternative means presented to the jury. If the evidence is sufficient to support each of the alternative means submitted to the jury, a particularized expression of unanimity as to the means by which the defendant committed the crime is unnecessary to

---

[15] Emphasis in original.
[16] Emphasis omitted.

affirm a conviction because we infer that the jury rested its decision on a unanimous finding as to the means.

Ortega-Martinez, 124 Wn.2d at 707-08.[17]

Murder in the second degree is an alternative means crime. State v. Berlin, 133 Wn.2d 541, 549, 947 P.2d 700 (1997). Under RCW 9A.32.050, a person can commit the crime of intentional murder in the second degree in violation of RCW 9A.32.050(1)(a), or felony murder with assault as the underlying felony in violation of RCW 9A.32.050(1)(b).[18] Lizarraga concedes sufficient evidence supports each of the alternative means. Lizarraga cites out-of-state cases to argue that in an alternative means case, the jury must unanimously agree on the means. However, the Washington Supreme Court recently re-affirmed that unanimity is not required where there is sufficient evidence to support each of the alternative means of committing the crime. Owens, 180 Wn.2d at 95 (citing Ortega-Martinez, 124 Wn.2d at 707-08).

> In reviewing this type of challenge, courts apply the rule that when there is sufficient evidence to support each of the alternative means of committing the crime, express jury unanimity as to which means is not required. If, however, there is insufficient evidence to support any means, a particularized expression of jury unanimity is required.

Owens, 180 Wn.2d at 95.

The conviction for murder in the second degree does not violate Lizarraga's right to a unanimous jury verdict.

---

[17] Emphasis in original.

[18] RCW 9A.32.050(1) states, in pertinent part:

A person is guilty of murder in the second degree when:
(a) With intent to cause the death of another person but without premeditation, he or she causes the death of such person or of a third person; or
(b) He or she commits or attempts to commit any felony, including assault, other than those enumerated in RCW 9A.32.030(1)(c), and, in the course of and in furtherance of such crime or in immediate flight therefrom, he or she, or another participant, causes the death of a person other than one of the participants.

Admission of Fingerprint and Ballistics Evidence

Lizarraga contends the court erred by denying his motion for a Frye[19] hearing on the ACE-V[20] technique used in this case to analyze fingerprints. We review de novo a trial court's decision whether to hold a Frye hearing. Anderson v. Akzo Nobel Coatings, Inc., 172 Wn.2d 593, 600, 260 P.3d 857 (2011).

Under Frye, " 'evidence deriving from a scientific theory or principle is admissible only if that theory or principle has achieved general acceptance in the relevant scientific community.' " State v. Baity, 140 Wn.2d 1, 10, 991 P.2d 1151 (2000) (quoting State v. Martin, 101 Wn.2d 713, 719, 684 P.2d 651 (1984)); State v. Copeland, 130 Wn.2d 244, 255, 922 P.2d 1304 (1996). Evidence involving new methods of proof or new scientific principles is subject to a Frye hearing. Baity, 140 Wn.2d at 10. However, after general acceptance of a methodology in the scientific community, application of the methodology to a particular case is a matter of weight and admissibility under ER 702. Baity, 140 Wn.2d at 10.

Lizarraga requested a Frye hearing on the ACE-V technique of fingerprint comparison. Citing a 2009 report by the National Research Council of the National Academy of Sciences (NAS Report), the defense argued latent fingerprint identification is no longer generally accepted in the scientific community. Lizarraga also filed a motion to limit firearm matching testimony. Lizarraga requested that opinion testimony on ballistics comparison "be limited to illustrating similarities without conclusion as to a

---

[19] Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).

[20] ACE-V is an acronym for " 'analysis, comparison, evaluation, and verification.' " State v. Pigott, 181 Wn. App. 247, 249-50, 325 P.3d 247 (2014) (quoting United States v. Mitchell, 365 F.3d 215, 221 (3rd Cir. 2004)).

connection with individualized pistol" and that the State's witnesses not give an opinion "as to probability or degree of certainty."

The trial court denied the motion for a Frye hearing and to limit expert testimony.[21]

Lizarraga does not dispute that the fingerprint and ballistics expert witnesses were qualified as experts or that the proffered testimony was helpful to the jury. Lizarraga claims the NAS Report raises questions as to the continued acceptance of the ACE-V technique used to analyze his fingerprints.

This court recently considered and rejected the same argument in State v. Pigott, 181 Wn. App. 247, 251, 325 P.3d 247 (2014). We adhere to our decision in Pigott.[22] Here, as in Pigott, the expert witnesses used the generally accepted ACE-V technique to analyze the fingerprint evidence.[23] The court did not err in denying Lizarraga's request for a Frye hearing and to limit expert testimony.

---

[21] The court ruled, "Latent fingerprints, evidence and expert testimony has been and continues to be generally accepted in the scientific community," and defense counsel did not present "sufficient new evidence which seriously questions the continued general acceptance of latent print evidence and expert testimony from the analysts in the relevant scientific community." The court also ruled ballistics testing evidence "has long been held to be generally accepted in the scientific community" and defense counsel did not cite any "lawful authority" to support limiting the experts' testimony.

[22] Other courts have also concluded the NAS Report insufficient to warrant changes to the status of latent fingerprint identification evidence. See United States v. Rose, 672 F.Supp.2d 723, 725-26 (D. Md. 2009) (despite NAS Report, "fingerprint identification evidence . . . is generally accepted in the relevant scientific community, has a very low incidence of erroneous misidentifications, and is sufficiently reliable to be admissible under Fed. R. Ev. 702"); Johnston v. State, 27 So.3d 11, 20-21 (Fla. 2010) (NAS Report "lacks the specificity that would justify a conclusion that it provides a basis to find the forensic evidence admitted at trial to be infirm or faulty"); Commonwealth v. Gambora, 457 Mass. 715, 933 N.E.2d 50, 55-61, 61 n.22 (2010) ("nothing in this opinion should be read to suggest that the existence of the NAS Report alone will require the conduct of . . . hearings as to the general reliability of expert opinions concerning fingerprint identifications").

[23] Because Lizarraga did not request a Frye hearing on the ballistics evidence, we do not address this argument. See In re Det. of Post, 145 Wn. App. 728, 755-56, 187 P.3d 803 (2008) (failure to seek a Frye hearing in trial court constitutes waiver of the issue on appeal).

Reasonable Doubt Jury Instruction

Lizarraga challenges the jury instruction defining "reasonable doubt" in 11 Washington Practice: Washington Pattern Jury Instructions: Criminal 4.01, at 85 (3d ed. 2008) (WPIC). Specifically, the language that states, "A reasonable doubt is one for which a reason exists." Lizarraga claims the language undermines the presumption of innocence and the burden of proof. But in State v. Bennett, 161 Wn.2d 303, 318, 165 P.3d 1241 (2007), our Supreme Court expressly approves the WPIC as a correct statement of the law and directs courts to use WPIC 4.01 to instruct on the burden of proof and the definition of reasonable doubt. See also State v. Pirtle, 127 Wn.2d 628, 656-58, 904 P.2d 245 (1995) (concluding WPIC 4.01 adequately permits both the government and the accused to argue their theories of the case).

We affirm the jury convictions of murder in the second degree while armed with a firearm, two counts of unlawful possession of a firearm, residential burglary, theft of a firearm, and possession of a stolen firearm.

WE CONCUR: