IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 34035-0-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| CARRIE LEE AENK, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, C.J. — Carrie Aenk appeals convictions for attempted second degree theft and third degree theft. She argues that the trial court denied her the constitutional right to present a defense when the court excluded hearsay testimony. She also argues the State presented insufficient evidence on which to convict her. We disagree and affirm the convictions.

FACTS

Carrie and Allan Aenk, wife and husband, operate Shepherd's Way Animal

Rescue (Shepherd's Way), a dog and horse rescue ranch in Springdale. On July 6, 2013, Elle Hatfield, of Post Falls, Idaho, called Shepherd's Way to discuss an advertisement for the adoption of a rescue horse. Hatfield's husband, Dustin, then labored in Afghanistan. Hatfield spoke with Carrie Aenk, owner and manager of Shepherd's Way. Hatfield mentioned that she desired a horse for her autistic daughter to ride. Aenk responded that she works with autistic children on her ranch and the advertised horse, Duke, suited Hatfield's needs. Aenk also volunteered that other potential buyers had showed interest in Duke and that Aenk would sell to the first acceptable offeror.

The day following the phone call, Elle Hatfield and her daughter visited Shepherd's Way, where Hatfield examined Duke. The daughter fell in love with Duke. Because of other potential buyers, Hatfield signed a contract on July 7 for Duke's adoption. The contract required a $500.00 nonrefundable adoption fee. Hatfield tendered a check for $520.00, $500.00 for the adoption fee and $20.00 for a book written by Carrie Aenk. On August 9, 2013, Carrie Aenk cashed the $520.00 check at Global Credit Union in Spokane.

Elle and Dustin Hatfield recently had purchased a home with acreage, and the property lacked a fence for a horse. On July 7, Elle Hatfield mentioned to Carrie Aenk that Hatfield must board Duke until she erected a fence on her property. Aenk agreed to board Duke temporarily. Aenk also insisted on teaching the Hatfield daughter in riding

2

Duke before the Hatfields took Duke home. During the visit to Shepherd's Way, Elle Hatfield inquired about other adoptable horses.

During this first visit, Elle Hatfield asked Carrie Aenk for a copy of the signed Duke purchase agreement. Because the two stood in the field, Aenk stated she would later e-mail Hatfield a copy. Hatfield never received a copy.

A week later, Elle Hatfield and her daughter returned to Shepherd's Way so that the teenager could ride Duke. Carrie Aenk instructed the daughter on riding Duke.

During this second visit, Elle Hatfield again expressed interest in adopting other horses. Aenk mentioned Quinn and Baron as her only adoption horses, yet claimed they were her favorite horses. Still, Aenk asserted that she would not sell either horse for less than $5,000. Hatfield assumed that Aenk joked about a price since Aenk earlier stated she would not sell either equine. Hatfield jested that she would not pay $5,000 for a horse. Aenk then grew friendlier and talkier. Hatfield remarked that she would pay $2,500. Aenk replied: "Yeah, a piece." Report of Proceedings (RP) at 139. Hatfield exclaimed that her husband would not approve of paying $2,500 per horse, after which Aenk labeled Hatfield a "trophy wife." RP at 139. Carrie Aenk then escorted Elle Hatfield to the location of Quinn and Baron. Hatfield adored the loveable Tennessee Walkers, stated she wanted the two horses, but repeated that she would not pay Aenk's price. Carrie Aenk stated she would speak to her husband about a sale of the horses, and

3

the conversation and visit ended.

At some unidentified time, Elle Hatfield called Carrie Aenk to schedule a time for Hatfield's daughter to again ride Duke. Hatfield asked Aenk if Aenk had spoken to her husband about the sale of Quinn and Baron. According to Hatfield, Aenk responded that she had spoken to her husband, the two were reluctant to sell the two horses for $2,500, but, since no one else rode the horses, they would sell the Tennessee Walkers for $2,500. Hatfield ended the conversation by stating she wanted her husband to see the horses.

Upon Dustin Hatfield's return from Afghanistan, Dustin, Elle, and their daughter traveled to Shepherd's Way to see Quinn and Baron. During this August 18, 2013 visit, the daughter rode Duke. Elle Hatfield met Carrie Aenk's husband, Allan, and Dustin Hatfield met both Aenks. Carrie showed the Hatfields Quinn and Baron. Dustin Hatfield sought to reaffirm that the total price for the two horses was $2,500, and, according to Dustin, Carrie Aenk expressed agreement to the figure.

Elle Hatfield commenced to complete one form contract for the purchase of Quinn and Baron. Carrie Aenk interrupted Elle, presented Elle with a second contract, and directed Elle to complete a contract for each horse. Hatfield then crossed out Baron's name from the first contract. Elle asked her husband for the answer to $2,500 divided by two. Dustin Hatfield responded $1,250, but then checked his head math with his cellphone's calculator. According to Elle Hatfield, she then completed both contracts by

4

inserting $1,250 as the nonrefundable adoption fee for the respective horses. Dustin Hatfield wrote a check to Carrie Aenk for $2,500. Dustin postdated the check to August 24, 2013.

On August 18, the Hatfields left Shepherd's Way without a copy of the two contracts. Carrie Aenk told the couple she would later e-mail them copies. Aenk added that she and her husband held the right to inspect the Hatfields' property at any time to determine the property's suitability to house a horse. The Aenks kept possession of Quinn and Baron until the Hatfields erected a suitable fence to keep the horses.

Carrie Aenk claims Elle and Dustin Hatfield agreed, on August 18, to pay $2,500 per horse. Copies of each contract later in the possession of Carrie Aenk state the purchase price for each horse to be $2,500. Nevertheless, the copies show some doctoring of the nonrefundable price. According to Allan Aenk, Elle Hatfield wrote a check for $2,500. The Hatfields would pay the remaining $2,500 on delivery of the horses.

Between August 18 and 24, 2013, Carrie and Allan Aenk visited the Hatfields' property at least three times. On the first visit, the Aenks told the Hatfields that the Hatfields needed to purchase other fence posts and alter the configuration of the fence. The Hatfields obeyed. The alterations cost $1,000. On the second visit, the Aenks demanded one more change in the fence.

5

On Saturday, August 24, 2013, Carrie Aenk telephoned Elle Hatfield. Aenk reported that the Hatfields' postdated check would not clear the banking system. Hatfield called her bank, which informed her that her account held sufficient funds to pay the check. Hatfield called Aenk and informed Aenk that she should encounter no difficulty in cashing the check. The two then dialogued:

> [AENK:] "Well, I need the money or you guys can't get the horses delivered."
> [HATFIELD:] "Okay, well, you know, we can meet you at the bank."
> [AENK:] "No, I just need cash."
> [HATFIELD:] "Okay, if you bring us the check, we'll get you cash."
> [AENK:] "Okay, well, Allan and I are already in town; so we can just meet you at the property."

RP at 154-55.

The Hatfields went to their bank and withdrew $2,500 in cash. The Hatfields and the Aenks then met at the Hatfields' property. According to Elle Hatfield, her husband exited the family car and handed the cash to one of the Aenks, who remained in their vehicle. The Aenks did not return the $2,500 check and did not provide Dustin Hatfield a receipt for the cash.

According to Allan Aenk, he discussed with Elle and Dustin Hatfield, during the August 24 visit, a time for the delivery of the horses and access to water for the horses at the Hatfields' land. The record does not show Carrie Aenk to be present during the

6

discussion. Allan Aenk insisted that the Hatfields had yet to prepare the property to care for horses. He also stated that he and his wife agreed to delivery of the horses on Monday, August 26.

Upon Dustin Hatfield's return to the car, Elle Hatfield learned that Dustin received no receipt nor the $2,500 check. From the car, Elle Hatfield called Carrie Aenk, and the two conversed by speaker phone:

> [HATFIELD:] "So, Carrie, um, you forgot to bring us the check."
> [AENK:] "Yeah. Oh, darn it. It's at my house."
> [HATFIELD:] "Yeah, and you were going to bring that receipt, too."
> [AENK:] "Yeah, I'll bring it when I bring the horses."

RP at 155.

Elle and Dustin Hatfield anticipated delivery of Quinn and Baron on August 25, 2013, the day following the tender of the $2,500 in cash. The Aenks appeared on August 25 without the horses. The Aenks announced that, because of other commitments, they were unable to deliver the Tennessee Walkers for another two weeks. The Aenks also had yet to deliver Duke to the dismay of the Hatfield daughter.

On August 26, 2013, Elle Hatfield texted Carrie Aenk and wrote that, if the Aenks did not deliver Quinn and Baron by August 27, the Hatfields would cancel the contract to purchase the two horses. Elle Hatfield volunteered to retrieve the horses from Shepherd's Way. Carrie Aenk responded that the Aenks already had a commitment and would not

7

engage in two commitments at one time. Eventually Aenk texted Hatfield:

> If the unreasonableness continues, I will abide by the contract and determine that the horses will be unsafe in that environment and cancel all three contracts.

Ex. 13. Elle Hatfield reminded Carrie Aenk that Aenk had never mailed a copy of the contracts to Hatfield. Aenk ended the texting with a threat and a prophecy:

> If you come to the ranch, you will be trespassing. See you in court.

Ex. P-15.

During the morning of August 27, 2013, Dustin Hatfield and Carrie Aenk spoke by phone. Aenk stated that the Board of Directors of Shepherd's Way voted to preclude the Hatfields from adopting the three horses because of a hostile environment at the Hatfields' property. Aenk declared, however, that Shepherd's Way would refund the Hatfields the purchase prices.

Later on August 27, 2013, Carrie Aenk visited ACE check cashing service and attempted to cash the $2,500 check. ACE called Dustin Hatfield. Dustin directed ACE not to cash the check. Aenk later claimed that she was just trying to see if the check remained valid. She also declared that she was entitled to the check. Dustin Hatfield called his bank and placed a stop payment order on the check. He then called Crime Check and reported the conduct of Elle Hatfield.

The Hatfields still pursued obtaining possession of the horses. The couple rented a trailer to ferry the horses from Shepherd's Way to the Hatfields' land. Carrie Aenk responded that she would shoot the Hatfields if the couple came near her ranch. The Aenks never delivered any of the three horses to the Hatfields.

PROCEDURE

The State of Washington charged Carrie Aenk with attempted second degree theft and third degree theft. The attempted second degree theft charge arose from the receipt of at least $2,500 for the purchase of Quinn and Baron without an intention to deliver the horses to the Hatfields. The third degree theft charge stems from the receipt of $500 for the acquisition of Duke without an intent to deliver the horse to the Hatfields.

During trial, Elle Hatfield testified that she eventually concluded that the Aenks would not deliver any of the three horses. Dustin Hatfield testified that Carrie Aenk stole $3,000, that he concluded that the Hatfields would never see the horses again, and that the Hatfields would lack recourse to rectify the theft.

During Allan Aenk's testimony, defense counsel asked Allan questions about comments made by Elle and Dustin Hatfield to him and discussions between the three, on August 24, as to the date of delivery of the horses. The State repeatedly objected to the questions on hearsay grounds. The crux of the questioning follows:

Q. . . . On that Saturday [August 24, 2013], did you have discussions with either Mr. or Mrs. Hatfield about when the horses could be delivered?

A. Yes.

Q. Okay. And what was the substance of those discussions?

MS. ZAPPONE: Objection, hearsay.

THE COURT: So Counsel, he can testify to what he said; but if you're asking for the substance of the discussions, you're asking him to testify to what other people said.

MR. WALL [Defense Counsel]: Well, Your Honor, I don't know how the jury can understand what happened if he can't testify as to what was talked about in terms of when the horses would be delivered.

RP at 374-75.

After excusing the jury, Allan Aenk and the trial court discoursed:

[ALLAN AENK]: So if I base my actions and my language or my discussion with Elle and Dustin, if I base that off of what they've told me, I can't say that they told me this and that's why I did this. Is that what you're saying?

THE COURT: I'm telling you you can't testify to what they told you. I will let you testify to what you did. You just can't say, "They told me this." It's hearsay.

RP at 377-78.

Defense counsel argued that he did not offer Allan Aenk's testimony for the truth of the matter asserted. Counsel asserted that he would use the testimony to explain Elle Hatfield's state of mind concerning the horse transactions. Counsel also argued that the comments made by the Hatfields to Allan Aenk helped to establish the agreement reached between the parties as to the timing of delivery of the horses. Nevertheless,

10

Carrie Aenk presented no offer of proof that Allan Aenk later told Carrie Aenk what the Hatfields said such that Carrie Aenk relied on the Hatfields' statements when reflecting on the agreed time for delivery. Carrie Aenk presented no testimony that she was present and overheard the conversation between her husband and the Hatfields. Her counsel never asked her if she had a conversation with the Hatfields concerning timing of delivery.

Carrie Aenk testified to the following:

> Q. Okay. We talked about these contracts, okay, and that each of them says $2,500 for Quinn and [Baron], correct?
> A. Correct.
> Q. Was that what was written on those contracts when you first received them?
> A. Yes.
> Q. Okay. Did you alter that in any way?
> A. No.
> Q. Did you ever scratch out a different number and replace it?
> A. No.
> Q. Was it your understanding that the Hatfields had agreed to pay a $2,500 adoption fee for each of the horses Quinn and [Baron]?
> A. Correct.
> Q. Okay. And did you receive payment for Quinn?
> A. Yes.
> Q. Okay. And did you have an understanding that you were supposed to wait any period of time before negotiating that check?
> A. Yes.

RP at 451.

> Q. Okay. Were you anticipating when you got to the property that you were going to collect cash from Mr.—
> A. Yes.

11

Q. —Hatfield? Okay. And did you collect cash?
A. Yes.
Q. And how much?
A. $2,600.
Q. And what was your understanding of what that money was for?
A. It was for Quinn's adoption fee.

RP at 455.

Q. And did you ultimately end up keeping the check?
A. Yes.
Q. Okay. What was your understanding of why you were keeping the check?
A. Because we were—I can't give hearsay.
Q. No. I'm just asking you what your understanding was.
A. My understanding of being allowed to keep the check was for the second payment for [Baron].
Q. Okay. And did you then intend at some point to negotiate that check for the contract for [Baron]?
A. We didn't try to negotiate it.
Q. No, no. Did you intend at some time to cash that check? Not on that day.
A. Not on that day. We went to verify it, but we did not try to cash it.
Q. I'm asking if you intended to cash that check at some point.
A. At some point.
Q. Okay. And at what point did you intend to actually cash the check?
A. When we delivered [Baron].

RP at 458-59.

Q. . . . Did Mrs. Hatfield ask you something in that phone call?
A. Yes.
Q. What did she ask you?
A. Why haven't we cashed the check yet?
Q. Okay. And what did you tell her?

12

A. I told her because we weren't supposed to cash it until after [Baron] was delivered.

RP at 460. Carrie Aenk did not testify that her husband mentioned to her statements made by Elle and Dustin Hatfield about an agreed time for delivery of any of the three horses.

The jury found Carrie Aenk guilty of both attempted second degree theft and third degree theft. Aenk filed a motion for a new trial based on the trial court's decision to sustain the hearsay objections during Allan Aenk's testimony. The trial court denied the motion.

## LAW AND ANALYSIS

*Issue 1: Whether the proposed testimony of Allan Aenk constituted inadmissible hearsay?*

*Answer 1: Yes.*

Carrie Aenk argues that the trial court erred when sustaining a series of hearsay objections during Allan Aenk's testimony. The objections followed questioning of Allan Aenk concerning statements made by Elle and Dustin Hatfield to Allan on August 24, 2013, at the Hatfields' property.

This court reviews evidentiary rulings for manifest abuse of discretion. *State v. Russell*, 125 Wn.2d 24, 78, 882 P.2d 747 (1994). Discretion is abused only when no

13

reasonable person would have decided the issue as the trial court did. *State v. Rice*, 110 Wn.2d 577, 600, 757 P.2d 889 (1988).

Hearsay is defined as an out of court statement "offered in evidence to prove the truth of the matter asserted." ER 801(c). A statement is not hearsay if it is used only to show the effect on the listener without regard to the truth of the statement. *State v. Gonzalez-Gonzalez*, 193 Wn. App. 683, 690, 370 P.3d 989 (2016); *State v. Edwards*, 131 Wn. App. 611, 614, 128 P.3d 631 (2006).

According to Carrie Aenk, statements uttered by the Hatfields to Allan Aenk helped to establish Carrie Aenk's belief as to the agreement between the parties, particularly concerning a date for delivery of the horses. Carrie Aenk may also argue that the trial court should have admitted Allan Aenk's testimony concerning purported comments of the Hatfields in order to show the impact of the statements on Allan. Nevertheless, the effect on Allan is not directly relevant to criminal charges against Carrie Aenk. Also, Carrie Aenk presented no testimony that her husband relayed to her any comments uttered to him by the Hatfields. Thus, the Hatfield comments would lack any impact on Carrie Aenk's understanding of any agreement. The trial court did not abuse its discretion in excluding the testimony.

Carrie Aenk contends that the trial court also precluded her from testifying as to comments uttered by the Hatfields to Carrie about the timing of delivery of the horses.

14

The only citation to the record given by Aenk for this purported preclusion is a section of a brief in support of a motion for reconsideration. The brief, in turn, contains no citation to the transcript. Therefore, we conclude the trial court precluded no such testimony from Carrie Aenk. RAP 10.3(a)(6) requires an appellant to cite to the relevant portions of the record in the argument section of her brief. A party must cite to the record for assigned error. *Glazer v. Adams*, 64 Wn.2d 144, 149, 391 P.2d 195 (1964).

Carrie Aenk further assigns error to the trial court's purported refusal to allow her to testify that Dustin Hatfield directed her to keep the $2,500 check as the second payment for the adoption of Quinn and Baron. Again, the only citation in the brief to this alleged error is the brief in support of the motion for reconsideration. The motion for reconsideration lacks any citation to the trial record.

*Issue 2: Whether the trial court precluded Carrie Aenk from presenting a defense when the court sustained a series of hearsay objections during Allan Aenk's testimony.*

*Answer 2: No.*

Carrie Aenk contends the hearsay rulings also violated her right, under the Sixth Amendment to the United States Constitution, to present a defense. We discern no error.

When addressing her constitutional argument, Carrie Aenk argues that the standard of review for evidentiary rulings is de novo. The State responds that this reviewing court should employ an abuse of discretion criterion, the familiar review for evidentiary issues.

The standard of review under these circumstances is unclear. In *State v. Jones*, the Washington Supreme Court wrote: "[s]ince Jones argues that his Sixth Amendment right to present a defense has been violated, we review his claim de novo." 168 Wn.2d 713, 719, 230 P.3d 576 (2010). However, in *State v. Aguirre*, the state high court declared:

> Although Aguirre does have a constitutional right to present a defense, the scope of that right does not extend to the introduction of otherwise inadmissible evidence. The admissibility of evidence under the rape shield statute, in turn, "is within the sound discretion of the trial court." *State v. Hudlow*, 99 Wn.2d 1, 17, 659 P.2d 514 (1983).

168 Wn.2d 350, 362-63, 229 P.3d 669 (2010) (internal citations omitted). We do not need to resolve this conflict because under either standard we affirm the trial court.

The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973). A defendant's right to an opportunity to be heard in his defense, including the right to examine witnesses against him and to offer testimony, is basic in our system of jurisprudence. *Chambers v.*

16

*Mississippi*, 410 U.S. at 294. Nevertheless, an accused does not have a right to offer incompetent, privileged, or otherwise inadmissible evidence under standard rules of evidence. *Taylor v. Illinois*, 484 U.S. 400, 410, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988); *State v. Lizarraga*, 191 Wn. App. 530, 553, 364 P.3d 810 (2015), *review denied*, 185 Wn.2d 1022, 369 P.3d 501 (2016).

We previously held that the proffered testimony did not violate evidentiary rules. Therefore, the trial court committed no constitutional error.

*Issue 3: Whether sufficient evidence supports the element of "deception" for Carrie Aenk's theft in the third degree conviction.*

*Answer 3: Yes.*

Carrie Aenk argues that the State failed to produce evidence that she deceived the Hatfields when she accepted payment of the $500 nonrefundable adoption fee for Duke. We disagree.

Evidence is sufficient if a rational trier of fact could find each element of the crime beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 221-22, 616 P.2d 628 (1980) (plurality opinion). Both direct and indirect evidence may support the jury's verdict. *State v. Brooks*, 45 Wn. App. 824, 826, 727 P.2d 988 (1986). This court draws all reasonable inferences in favor of the State. *State v. Partin*, 88 Wn.2d 899, 906-07, 567 P.2d 1136 (1977). In claiming insufficient evidence, the defendant necessarily admits the

truth of the State's evidence and all reasonable inferences that can be drawn from it.

*State v. Homan*, 181 Wn.2d 102, 106, 330 P.3d 182 (2014). Only the trier of fact weighs

the evidence and judges the credibility of witnesses. *State v. Carver*, 113 Wn.2d 591,

604, 781 P.2d 1308, 789 P.2d 306 (1989).

The statute governing theft in the third degree provides:

> A person is guilty of theft in the third degree if he or she commits theft of property or services which (a) does not exceed seven hundred fifty dollars in value.

RCW 9A.56.050(1). In this context, "theft" means:

> [b]y *color or aid of deception* to obtain control over the property or services of another or the value thereof, with intent to deprive him or her of such property or services.

RCW 9A.56.020(1)(b) (emphasis added). RCW 9A.56.010 defines additional

terms:

> (4) "By color or aid of deception" means that the deception operated to bring about the obtaining of the property or services; it is not necessary that deception be the sole means of obtaining the property or services;
> (5) "Deception" occurs when an actor knowingly:
> . . . .
> (e) Promises performance which the actor does not intend to perform or knows will not be performed.

In her briefing, Carrie Aenk emphasizes her testimony regarding a lack of intent to

deceive. She focuses on her and her husband's testimony that the Hatfields had never

adequately prepared the Hatfields' property to care for horses and that the Aenks never

18

abridged an agreement to deliver the horses. Nevertheless, we determine sufficiency of evidence by construing the evidence in favor of the State. The State presented evidence, which the jury found credible, that Aenk never intended to deliver Duke, valued at $500, to the Hatfields. Exhibits showed alterations by Carrie Aenk of the contract price for the horses. Text messages showed hostile threats from Carrie Aenk to prevent the Hatfields from gaining access to the horses. Elle Hatfield testified to the delays and false promises of the Aenks. Dustin Hatfield testified to Carrie Aenk's attempt to cash a check despite a promise to the contrary. Both Hatfields averred concerning the constant delays in delivering the horses. Under the contract, the Hatfields paid a $500 nonrefundable price. The jury could have concluded that Carrie Aenk proffered illegitimate excuses to deliver Duke so that she could pocket the $500 without forgoing possession of Duke.

*Issue 4: Whether this court should award appellate costs in favor of the State?*

*Answer 4: No.*

Carrie Aenk asks this court to deny the State an award of costs on appeal in the event the State prevails. Generally "the party that substantially prevails on review" will be awarded appellate costs, unless the court directs otherwise in its decision terminating review. RAP 14.2. An appellate court's authority to award costs is "permissive," and a court may, pursuant to RAP 14.2, decline to award costs at all. *State v. Nolan*, 141 Wn.2d 620, 628, 8 P.3d 300 (2000). An appellate court has discretion to require a

19

convicted defendant to pay appellate costs to the State. RCW 10.73.160(1); RAP 14.2.

Carrie Aenk submitted a report of continued indigency that shows her persisting penury. Therefore, we deny the State appellate costs.

## STATEMENT OF ADDITIONAL GROUNDS

Carrie Aenk lists seven arguments in her statement of additional grounds. Each fails.

A criminal defendant can submit a pro se statement of additional grounds for review "to identify and discuss those matters related to the decision under review *that* the defendant believes have not been adequately addressed by the brief filed by the defendant's counsel." RAP 10.10(a). The rule additionally provides in part:

> Reference to the record and citation to authorities are not necessary or required, but the appellate court will not consider a defendant's statement of additional grounds for review if it does not inform the court of the nature and occurrence of alleged errors. Except as required in cases in which counsel files a motion to withdraw as set forth in rule 18.3(a)(2), the appellate court is not obligated to search the record in support of claims made in a defendant's statement of additional grounds for review. Only documents *that* are contained in the record on review should be attached or referred to in the statement.

RAP 10.10(c); *see also State v. Alvarado*, 164 Wn.2d 556, 569, 192 P.3d 345 (2008).

Carrie Aenk's statements 1, 6, and 7 reference information beyond the trial court record. Statements 2, 3, 4, and 5 rely on documents attached to Aenk's statement but

20

outside the trial court record. Therefore, we decline to address the merits of the statements of additional grounds.

## CONCLUSION

We affirm Carrie Aenk's convictions for attempted second degree theft and third degree theft. We deny the State costs on appeal.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, C.J.

WE CONCUR:

_____
Siddoway, J.

_____
Lawrence-Berrey, J.

21